# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

MELVIN WAYNE MURRAY   *

Plaintiff   *

v   *   Civil Action No. RDB-17-2574

WEXFORD HEALTH SOURCES, INC.,   *
RUTH PINKNEY, P.A.,  
  *

Defendants
  ***

## MEMORANDUM OPINION

In response to this civil rights complaint, Defendants Wexford Health Sources, Inc. and Ruth Pinkney move to dismiss or for summary judgment in their favor. ECF 37 & 43. Self-represented Plaintiff Melvin Wayne Murray also filed a motion for summary judgment, which is best construed as an opposition to Defendants' motion. ECF 39. Defendants have replied. ECF 49. No hearing is necessary for the disposition of the matters pending before the Court. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, Defendants' motion, construed as one for summary judgment, is GRANTED and Plaintiff's motion DENIED.

## I. BACKGROUND

### A. Plaintiff's Allegations

At the time he filed this Complaint, Murray was an inmate at the Eastern Correctional Institution (ECI).[1] He claims that during his chronic care clinic visits he complained to the Physician's Assistant (PA) (presumably Defendant Pinkney) about the symptoms of his conditions, which included chronic obstructive pulmonary disease (COPD), a hernia, and tardive

---

[1] On November 26, 2018, Murray advised the Court that he had been transferred to the Baltimore City Correctional Center. ECF 45.

dyskinesia (TD). ECF 1 at p. 3. The PA refused to refer him to a physician or to send him to an outside hospital for additional diagnostic testing. *Id.* at XX.[2]

Specifically, Murray complains that the only treatment rendered for his COPD was to prescribe him two inhalers. ECF 1 at 4. He claims that Pinkney has refused to allow him to be seen by a physician and that his COPD has worsened. *Id.* at 4, 6.

Murray also claims that Pinkney is aware of his TD which he describes as a chronic eye nerve condition caused by an overdose of Risperdal. *Id.* at 5. He claims that on two occasions he suffered serious side effects that left his eye blurry and caused constant blinking. *Id.* He states that the disease cannot be cured but can be treated. *Id.* He alleges that Defendants have failed to treat this condition or have delayed treatment for his vision, and he seeks referral to a neurologist and to be provided a Botox injection. *Id.* at 6. He also indicates that surgery could be performed to correct his condition. *Id.* Murray claims that Defendants' refusal to provide him access to a physician is improperly based on security and cost saving concerns, and that the medication he requires is on a restricted list. *Id.* at pp. 6-7.

Lastly, Murray claims that he suffers from recurrent hernia issues which cause bowel problems. ECF 1 at p. 7. He states that he underwent surgery in 2010 but the Defendants refuse him additional treatment. *Id.* He claims that they have not prescribed medication to treat his hernia symptoms, nor will they refer him to a doctor or outside hospital for testing because they do not believe that the hernia is serious. *Id.* Murray reports that when he coughs he "balls up in pain." *Id.* Murray has been provided a "belt" to treat the hernia, which he indicates worsens the pain and

---

[2] Murray named Correctional Defendants, former ECI Warden Kathleen Green and Warden Ricky Foxwell, in his Complaint. ECF 1 at 5. As they played no role in Murray's medical care, summary judgment was awarded these Defendants by Memorandum Opinion dated July 19, 2018. ECF 28 and 29.

2

causes irritation. *Id.* Murray seeks referral to an outside hospital for additional diagnostic testing or treatment. *Id.*

B. Defendants' Response

Defendants submit exhibits, including the affidavits of Jason Clem, M.D. and relevant portions of Murray's medical records from February 5, 2015 through October 17, 2018, when Murray attended a tele-med evaluation performed by Dr. Herjit S. Bajaj, a neurologist with Bon Secours Hospital. ECF 37-5 (Clem Affidavit); ECF 43-2 (Clem Affidavit II); ECF 37-4 (medical records 2/5/15-5/3/18); ECF 43-1 (medical record 10/17/18).

Defendants state that Murray has a history significant for an abscess, hypertension, COPD, asthma, seasonal allergies, eczema, chronic left should pain, glaucoma, abdominal and inguinal hernias. They indicate he also suffers from an eye condition that is either blepharospasm (an abnormal, involuntary blinking or spasm of the eyelids)[3] or TD (a side effect that may occur with certain medication used to treat mental illness that may appear as repetitive, jerking movements in the face, neck, and tongue).[4] Dr. Clem avers that Murray has received appropriate medical care for his conditions. ECF 37-5, ¶¶ 6, 7, 8; ECF 43-2, ¶ 4.

1. Eye Condition

Dr. Clem explains that TD is a disorder that results in involuntary jerking movement of the tongue, lips, face, trunk, and extremities. ECF 37-5, ¶ 5. It can be caused by long-term treatment with dopamine antagonists such as Risperdal. Murray, who presents with blinking of the eyes, admitted he suffered from involuntary movements prior to taking Risperdal. *Id.* Dr. Clem explains that it is unusual for TD to occur in the absence of neuroleptic medication. Given that Murray's

---

[3] *See* https://nei.nih.gov/health/blepha/blepharospasm (last visited June 6, 2019).
[4] *See* https://www.nami.org/Learn-More/Mental-Health-Conditions/Related-Conditions/Tardive-Dyskinesia (last visited June 6, 2019)

3

symptoms predated his use of Risperdal, Clem opines that it could indicate that his symptoms were not caused by TD but rather were blepharospasm or psychogenic in nature. *Id.*

Murray's medical records demonstrate that he was seen by an ophthalmologist, Dr. Summerfield, on February 5, 2015. Dr. Summerfield who regularly treated Murray for glaucoma, diagnosed Murray as suffering from blepharospasm in both eyes, and indicated that Botox treatment should be considered if Murray's condition became problematic. ECF 37-4 at 2.

Murray did not complain of excessive blinking during his chronic care visit on June 25, 2015, or during examinations on July 17 and 21, 2015. ECF 37-4 at pp. 4-8, pp. 11-13, 14-15. He also did not complain of excessive blinking in August of 2015, when he was seen by medical staff after being exposed to pepper spray. ECF 37-4 at p. 16.

Murray was again evaluated by Dr. Summerfield on August 27, 2015. ECF 37-4 at 18. His vision was 20/20 in one eye and 20/25 in the other. Symptoms of either blepharospasm or TD were observed; however, Dr. Summerfield noted that Murray was doing well and would continue to be monitored. *Id.* Dr. Summerfield did not recommend any additional treatment for the blepharospasm. *Id.*

Over the next several months Murray was regularly seen by medical staff but did not complain of excessive blinking during the examinations, which occurred on September 3 and 22, 2015, October 28, 2015, December 24, 2015, and January 22, 2016. ECF 37-4 at 19-20, 21-23, 24-26, 27, 34-36.

Murray again saw Dr. Summerfield on February 4, 2016. ECF 37-4 at 37. His vision was 20/25 in one eye and 20/30 in the other, and the blepharospasm was assessed as stable. *Id.* On February 26, 2016, during chart review, Sheila Kerpelman N.P. noted that Dr. Summerfield had

not renewed Murray's prescription for Xalatan (a medication to treat glaucoma)[5] but the plan was to continue the medication. *Id.* at 38-41. Murray was referred to optometry for new glasses. *Id.*

Over the next several months Murray continued to be seen by medical staff but did not offer any complaints regarding his eyes. On May 17, 2016, Murray was seen by N.P. Kerpelman in the chronic care clinic. ECF 37-4 at 42-48. Examination of his eyes was unremarkable and he did not complain of excessive blinking. *Id.* Murray was examined in the chronic care clinic on August 17, 2016, November 16, 2016, and February 27, 2017, but did not complain of excessive blinking on any of these occasions. ECF 37-4 at 53-60, 61-63, 64-68. He was seen on March 20, 2017 by a nurse for a sick call visit but did not complain of excessive blinking. *Id.* at 69-70.

On November 13, 2017, during a chronic care visit, Murray complained that he had been blinking a lot and had excessive tearing. ECF 37-4 at 78-83.

He did not offer any complaints regarding his eyes when he was seen in sick call on January 2, 2018. ECF 37-4 at 84-86.

After a chronic care clinic on January 22, 2018, an optometry consult was placed due to Murray's complaints of excessive blinking. ECF 37-4 at 88-94. On February 5, 2018, P.A. Cyran submitted a neurology consult to evaluate Murray's excessive blinking. *Id.* at 95-101. Cyran noted Murray's history of glaucoma and treatment by an ophthalmologist. She also noted that she discussed Murray's condition with a psychiatrist who recommended a neurological work up. *Id.* Cyran documented Murray's history of Risperdal use, including his report that he suffered facial contractions prior to being prescribed Risperdal in 2007, and that after he stopped taking Risperdal his facial tics continued. *Id.*

---

[5] *See* https://www.drugs.com/xalatan.html (last visited June 6, 2019).

5

On February 5, 2018, the request for neurology consultation was deferred and an alternative treatment plan to continue to monitor Murray was recommended. ECF 37-4 at 102. It was noted that the neurological complaint did not interfere with Murray's activities of daily living and were likely psychologically related. *Id.*

On April 13, 2018, Murray was evaluated again by Cyran in the chronic care clinic. ECF 37-4 at 106-112. He complained that the movements of his eyes and mouth were bothersome and interfering with his quality of life and that his medical needs were not being met. His history of Risperdal use was reviewed and his condition was discussed with psychiatry staff who indicated that they did not believe the condition was psychiatric in nature. *Id.* After discussing Murray's condition with the Medical Director, a second request for a neurological consult was placed. *Id.*

Murray was examined by Dr. Summerfield on May 3, 2018. ECF 37-4 at 113. Dr. Summerfield noted the abnormal movements and recommended that Murray be evaluated by a neurologist. *Id.* He also suggested Murray might benefit from a prescription for Botox. *Id.*

On October 17, 2018, Murray had a tele-med neurology consultation. ECF 43-1. During the conference, Murray reported that the blepharospasm symptoms resulted in his having difficulty writing letters due to having to blink a lot and that when he combed his hair he had to occasionally stop due to the blinking. ECF 43-2, ¶ 3. Dr. Bajaj, the neurologist, indicated he did not believe that Murray's symptoms were a result of a reaction to Risperdal but instead suspected blepharospasm. ECF 43-1. Dr Baja prescribed Klonopin 0.5 mg twice daily for a few months. *Id.* He did not believe Botox was warranted at that time. *Id.*

2. Pulmonary Condition

Murray has a history of asthma and COPD. A routine chest x-ray, read on April 29, 2015, showed clear lung fields and no evidence of acute disease. ECF 37-4 at 3.

6

Murray was seen in the chronic care clinic on June 25, 2015. ECF 37-4 at 4-8. He reported compliance with his COPD medications and stated that he used his prescribed albuterol inhaler every day. *Id.* He reported that his symptoms remained unchanged but that he had intermittent sputum. He was restarted on guaifenesin, an expectorant, and his prescription for an inhaler was renewed. The Nurse Practitioner did not observe Murray suffering from any difficulty in breathing or shortness of breath. *Id.*

During examinations on July 17 and 21, 2015, Murray's COPD symptoms remained unchanged. ECF 37-4 at 11-13, 14-15.

Defendant Ruth Pinkney, P.A. evaluated Murray in the chronic care clinic on October 28, 2015. ECF 37-4 at 24-26. She noted that Murray's COPD was controlled. *Id.*

On December 24, 2015, Murray was seen by Charlotte Townley, R.N. ECF 37-4 at 27. Murray reported that he was out of Symbicort, one of the medications used to treat his lung issues. *Id.* His peripheral capillary oxygen saturation was 95 and his peak flow was 150. *Id.* His prescriptions were renewed. *Id.* at 30.

PA Pinkney evaluated Murray in the chronic care clinic on January 22, 2016. ECF 37-4 at 34-36. Murray complained that his COPD was exacerbated over the past 10 days and he experienced more coughing, wheezing, and thick mucus. *Id.* He reported feeling better after receiving a DuoNeb treatment. *Id.* He did not report pleuritic pain or chest wall tenderness. *Id.* Bilateral wheezing suggesting bronchospasm was observed as well as a hacking cough. *Id.* Murray was prescribed, Naproxen, Mucus Relief, DuoNeb, and prednisone, and was directed to follow up in one week. *Id.*

On May 17, 2016, Murray was seen by N.P. Kerpelman in the chronic care clinic. ECF 37-4 at 42-48. His capillary oxygen saturation was 95 and his peak flow was 150. *Id.* At that time his

asthma was classified as severe and persistent with symptoms consisting of dry cough, shortness of breath at rest and with moderate exercise, waking at night with cough, shortness of breath, and wheezing, pleuritic pain, post nasal drip, and seasonal rhinitis. *Id.* Examination found left posterior crackles during auscultation. *Id.* Palpation was normal and lungs were clear to percussion. Plaintiff's respiratory effort was described as normal and there was no evidence of chest wall tenderness or cough. His prescription for DuoNeb was renewed. *Id.*

A chest x-ray was taken on May 24, 2016, which was normal. ECF 37-4 at 52. On May 25, 2016, Murray's prescription for Symbicort was again renewed. ECF 37-4 at 49-50

PA Pinkney treated Murray in the chronic care clinic on August 17, 2016. ECF 37-4 at 53-60. His capillary oxygen saturation was 96 and his peak flow was 100. *Id.* He reported an increased amount of mucus and drainage over the last couple of weeks which caused an increase in coughing. *Id.* His examination was unremarkable. He was prescribed an expectorant and his medications were renewed. *Id.*

Murray returned to the chronic care clinic on November 16, 2016. ECF 37-4 at 61-63. He was again evaluated by PA Pinkney. He reported that his COPD symptoms had worsened over the previous three weeks. *Id.* He complained of more wheezing and shortness of breath since the weather had changed. *Id.* Wheezing was observed during auscultation suggesting bronchospasm. No cough was observed and his respiratory effort was described as normal. *Id.* His medications were renewed. *Id.*

On February 27, 2017, PA Pinkney again examined Murray in the chronic care clinic. ECF 37-4 at 64-68. Plaintiff reported that he used his inhalers daily for COPD. *Id.* His capillary oxygen saturation was 94. *Id.* His examination was unremarkable and his medications were renewed. *Id.*

Murray returned to the chronic care clinic on June 29, 2017, where he was evaluated by N.P. Kerpelman. ECF 37-4 at 72-76. He reported that he was using DuoNeb once every two weeks and that he used the ProAir inhaler less often as it did not work as well as the DuoNeb. *Id.* It was noted that his most recent worsening of COPD was in December of 2016 and that his May 2016 chest x-ray was normal. It was further noted that Murray's allergies were well controlled with Zyrtec. *Id.* Examination by auscultation was described as "bilateral base decreased breath sounds." His cough was non-productive. *Id.* Kerpelman renewed Murray's medications. *Id.*

Sephanie Cyran, N.P. evaluated Murray in the chronic care clinic on November 13, 2017. ECF 37-4 at 78-83. His capillary oxygen saturation was 94 and his peak flow 60. *Id.* Murray reported that he was 90% compliant with his medication and indicated he used his ProAir inhaler 3 times a day and Symbicort twice a day. *Id.* His COPD was assessed as stable. His lung sounds were clear but diminished. Murray reported that in cold weather he used his rescue inhaler three times a day. A chest x-ray was ordered and it was noted that the Medical Director would be consulted regarding additional treatment. In the interim his then current plan of treatment continued. *Id.*

Murray returned to the chronic care clinic on January 22, 2018, complaining that his COPD was not well managed, he was continually out of breath, and his symptoms were worsening. ECF 37-4 at 88-94. Cyran indicated she would discuss possible medication changes with a physician. *Id.* Murray's prescriptions for DuoNeb and Symbicort were renewed. *Id.*

Murray was seen by Binta Bojan, CRNP at sick call on February 27, 2018 to evaluate whether changes should be made in his COPD medications. ECF 37-4 at 103-04. Murray reported that he did not request any changes. His condition was assessed as stable and no medication changes were made. *Id.*

9

On April 13, 2018, Murray was evaluated by Cyran in the chronic care clinic. ECF 37-4 at 106-112. He complained that his COPD had not been well managed, he was continually out of breath, and his symptoms were worsening. He reported that he could not tolerate walking from housing to medical and that he had an emergency breathing treatment the prior week which was not documented. *Id.*

Dr. Clem explains that Murray's asthma and COPD are treated with both short acting beta-agonists (albuterol) and long acting beta-agonists (symicort) and that he also receives biweekly nebulizer treatments with DuoNeb. ECF 38-5, ¶ 7. When Murray's symptoms are exacerbated he has received relief with prednisone. *Id.* Generally, Murray's asthma and COPD have been stable under this treatment regimen. *Id.*

3. <u>Hernia</u>

Murray was seen by Melissa Richbak, R.N. on July 2, 2015, in response to a sick call slip complaining of an intermittent right inguinal hernia. ECF 37-4 at 9-10. Murray was referred to a provider and was seen by Peter Stanford, P.A. on July 17, 2015, who found a very tender 10-22 centimeters bulge along Murray's right inguinal canal which did not reduce when Murray laid down. *Id.* at 11-13. Stanford assessed Murray as suffering from a non-reducible hernia, issued Murray a hernia belt, and referred him to a physician. *Id.*

Paul Matera, M.D. evaluated Murray on July 21, 2015. *Id.* at 14-15. Murray explained that 7-8 months earlier he coughed and had pain in the right groin but no bulge. *Id.* Four months prior he felt a bulge in the right groin that was not present during Matera's exam despite Stanford's note on July 17th indicating the hernia was not reducible. *Id.* Matera assessed Murray as not suffering from a hernia, although the area was tender to deep palpation. *Id.*

On August 8, 2015, Murray was evaluated for pepper spray exposure. He reported that the pepper spray made him vomit and irritated his hernia. ECF 37-4 at 16-17. He was not in acute distress and was instructed to wear his hernia belt. *Id.*

Sheila Kerpelman, N.P. evaluated Murray on September 3, 2015. ECF 37-4 at 19-20. It was noted that Murray had received hernia trusses for right groin pain but reported that he only wore a truss once because it was uncomfortable. *Id.* He was encouraged to wear the truss and follow up in two weeks for evaluation. *Id.* On September 22, 2015, Murray was seen by Dr. Matera for non-compliance with his hernia truss. ECF 37-4 at 21-23. At the time of exam, Murray left the truss in his cell and complained that it was uncomfortable. Matera again advised Murray of the purpose of the truss and the need for wearing it. Murray reported that he did not have a hernia but only intermittent pain. *Id.*

Ruth Pinkney, P.A. evaluated Murray in the chronic care clinic on October 28, 2015. ECF 37-4 at 24-26. Murray again reported that he did not wear the hernia belt/truss because it was uncomfortable. He also explained that he felt it made the hernia worse. *Id.*

During an examination on December 24, 2015, he reported he did not comply with the directives to wear the hernia truss. ECF 37-4 at 27. He complained of pain from the right inguinal hernia radiating to the right testicle. *Id.* at 28-33. He reported to the Nurse Practitioner that Dr. Matera was scheduling surgery. The nurse advised him that the truss was the only treatment plan, and again educated him regarding the importance of compliance. *Id.*

He did not complain of hernia pain during his January 22, 2016, May 17, 2016, August 17, 2016, or November 16, 2016 examinations. ECF 37-4 at 34-36, 42-48, 53-60, 61-63.

On February 27, 2017, PA Pinkney again examined Murray in the chronic care clinic. ECF 37-4 at 64-68. At this time, Murray complained of pain in his hernia when he coughed. *Id.* He

11

denied vomiting and reported that his abdominal discomfort improved when he laid flat. He reported that he no longer had a hernia belt because it was taken during an inspection when he could not produce paperwork authorizing his possession of the belt. *Id.* He reported being constipated and requested a stool softener. *Id.*

Murray was seen by Ellen Moyer. R.N. on March 20, 2017, due to a sick call slip he submitted complaining that he had not received, among other things, his hernia belt. ECF 37-4 at 69-60. He had been measured for the belt on February 28, 2018. *Id.* He was advised that it would take a few weeks to get the hernia belt (*id.*) and on May 16, 2017 he was issued another hernia belt. *Id.* at 71.

During a routine chronic care clinic visit on June 29, 2017, where he was evaluated by N.P. Kerpelman, Murray reported that he had 3-4 bowel movements weekly which were soft and formed and that while he avoided straining he still had right umbilical and groin pain. ECF 37-4 at 72-76. Examination revealed that Murray's abdominal muscles had a rounded contour and he was assessed as not having a hernia. *Id.*

During a chronic care visit on November 13, 2017, Murray reported that his umbilical hernia was painful but reducible. ECF 37-4 at 78-83. He reported that coughing made the hernia worse. He was advised that the Medical Director would be consulted regarding medical treatment. *Id.* Examination demonstrated abdominal pain on palpation but was otherwise unremarkable. His bottom bunk order was renewed for a year and his treatment plan was continued. *Id.*

Tracy Hall, R.N. examined Murray on January 2, 2018, in response to a sick call slip complaining of right groin pain. ECF 37-4 at 84-86. Murray was not wearing his hernia belt and was educated regarding use of the belt. *Id.* He was sent, via wheelchair, back to his housing unit

to get the belt and directed to return to medical if his symptoms continued after using the belt. *Id.* The following day he was issued another hernia belt. *Id.* at 87.

Murray returned to the chronic care clinic on January 22, 2018, complaining that his right hernia pain was getting worse despite his wearing the hernia belt. ECF 37-4 at 88-94. He reported that the belt did not work and the hernia was "popping out again." *Id.* Cyran indicated she would consult with a physician whether any other medical treatment was indicated beyond use of the belt. *Id.*

On February 5, 2018, the request for hernia surgical review was deferred as the hernia was reducible and an alternative treatment plan onsite with truss support, analgesics, weight loss, and lifting restrictions was recommended. ECF 37-4 at 105.

On April 13, 2018, Murray was evaluated by Cyran in the chronic care clinic. ECF 37-4 at 106-112. He reported that his right hernia pain was getting worse despite wearing the belt and that his pain level reached 7 out of 10 and interfered with his daily activities. *Id.* Cyran indicated that a physician would be consulted regarding whether any other medical treatment was indicated and also noted the current plan was to observe onsite. *Id.*

Dr. Clem explains that Murray's intermittent inguinal and abdominal hernias are near the site of the surgical scar from a 2010 surgical repair of his hernia. ECF 37-5, ¶ 8. Dr. Clem avers that since the hernias are reducible, surgery is not medically indicated. *Id.* He further explains that although Murray has been issued hernia trusses to treat his condition, Murray is frequently non-compliant with their use. *Id.* Dr. Clem indicates that the truss is a proven method for "both limiting the hernia occurring and treating associated pain with compression." *Id.*

## II. STANDARD OF REVIEW

Defendants have filed a Motion to Dismiss, or, in the Alternative, for Summary Judgment.

Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). To the extent that grounds for dismissal are based solely on the contents of the Complaint, the Court may dismiss under Rule 12(b)(6) if the complaint does not allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pled allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Rule 12(d) requires courts to treat a Rule 12(b)(6) motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied by the title of the Motions. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party

must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d), or otherwise put the district court on notice of the reasons why summary judgment is premature. *See Harrods, Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002). Here, Plaintiff has not filed a Rule 56(d) affidavit or otherwise requested discovery in this matter. Under these circumstances, the Court will construe Defendants' Motion as a Motion for Summary Judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

Because he is proceeding pro se, Plaintiff's submissions are liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, this Court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted).

## III. ANALYSIS

A. Claims against P.A. Pinkney

At its core, Murray's claim against Pinkney is that she violated the Eighth Amendment prohibition against cruel and unusual punishment due to her deliberate indifference to his serious medical conditions. Deliberate indifference to a serious medical need requires proof that, objectively, a prisoner was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). The parties do not dispute that Murray suffers from serious medical conditions, including COPD, an eye disorder, and a hernia. Proof of these objectively serious medical conditions, however, does not end the inquiry.

16

The subjective component requires "subjective recklessness" in the face of the serious medical conditions. *See Farmer*, 511 U.S. at 839-40; *see also Anderson v. Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017). Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because 'prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable.").

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)); *see also Jackson*, 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that

failure to provide it would pose an excessive risk). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013).

The record evidence demonstrates that Murray did not consistently complain regarding the issue with his eyes. When the condition worsened, his medical providers consulted and he was referred for a neurological consultation. Murray's contention that he suffers from TD is not supported by the record. Additionally, there is no indication in the record that the sole named medical provider, PA Pinkney, in anyway interfered with Murray's evaluation or treatment. The Court concludes that Murray cannot establish the subjective element of a deliberate indifference claims regarding the treatment of his eye condition as to any of the named Defendants.

Similarly, the evidence demonstrates that Murray received regular evaluations for his COPD and asthma. His pulmonary issues were described as stable and his medications were consistently renewed, reviewed, and reevaluated. He was regularly examined and additional diagnostic testing such as chest x-rays and pulmonary function tests performed in order to monitor and treat his chronic conditions. As summarized in the Background Section, Murray's unrefuted medical record shows that he was repeatedly evaluated and treated by institutional providers regarding his pulmonary issues.

Likewise, despite Murray's claims, he received regular care for his hernia. The record demonstrates that Murray was noncompliant with the treatment provided. Nevertheless, medical providers replaced Murray's hernia belt and provided him analgesic pain medication. A surgical treatment was considered and rejected by the Medical Director.

Simply stated, the undisputed record establishes that Murray received adequate treatment for the medical complaints he presented to medical staff. To the extent he believed he was entitled to more than the treatment provided, his claim represents a mere disagreement with the treatment provided to him. Further, the complaint fails to establish that Murray suffered a cognizable injury due to the failure to provide him with the treatment of his choice. Murray has failed to attribute any deliberate failure to provide him with treatment for a serious medical need to PA Pinkney.

B.   Claims against Wexford

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a Bivens suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Murray fails to establish that Wexford's

policies in any way restricted the medical care provided. Wexford is entitled to summary judgment in its favor.

## CONCLUSION

Having found no factual basis for Murray's claims, Defendants' dispositive Motion, construed as a Motion for Summary Judgment, will be GRANTED and judgment will be ENTERED in favor of Defendants and against Plaintiff. Murray's Motion for Summary Judgment will be DENIED. A separate Order follows.

JUNE 11, 2019
Date

/s/ Richard D. Bennett
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE